MINNESOTA & OREGON LAND & TIMBER CO. et al. v.
HEWITT INV. CO.

(District Court, D. Oregon. January 6, 1913.)

No. 3,125.

1. ESCROWS (§ 1*)—WHAT CONSTITUTES—CONDITION—NECESSITY OF WRITING
   —"ESCROW."
   A deed in "escrow" is one that has been delivered to a stranger with
   directions that he shall deliver to the grantee on performance by the
   latter of some condition, which may be either oral or written or partly
   oral and partly written, as to the payment of a sum of money, or the
   observation of some obligation, or the happening of some event; the
   grantor reserving the right to reclaim the deed if the condition is not
   fulfilled, or the event does not happen.
   [Ed. Note.—For other cases, see Escrows, Cent. Dig. §§ 1–3, 5; Dec.
   Dig. § 1.*
   For other definitions, see Words and Phrases, vol. 3, pp. 2464–2467.]

2. SPECIFIC PERFORMANCE (§ 25*)—CONTRACT TO CONVEY—EXECUTION OF DEED.
   Mere execution of a deed by a vendor to a purchaser, without deliv-
   ery, unless deposited as a perfect escrow, is insufficient to constitute a
   contract to convey which can be made the subject of specific performance.
   [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§
   56–58, 60; Dec. Dig. § 25.*]

3. FRAUDS, STATUTE OF (§ 103*)—SALE OF LAND—WRITTEN CONTRACT.
   Correspondence between the parties to a sale of land, together with a
   deed sent by the vendor to a bank describing the land referred to, with
   directions for delivery to the vendee on the payment of the price, held
   to constitute an enforceable contract in writing for the sale of the land.
   [Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 192–
   208; Dec. Dig. § 103.*]

4. CORPORATIONS (§ 425*)—OFFICERS—AUTHORITY—CONVEYANCE OF LAND—
   ESTOPPEL.
   The by-laws of defendant investment company authorized its president,
   with the approval of the other members of the finance committee, which
   consisted of the president and two other members of the board of di-
   rectors, to buy and sell real property without further specific authority
   from the board. By article 7 the president was made general manager
   with full power to buy real estate or anything which the company was
   entitled to hold, buy, or sell, subject to the approval of the finance com-
   mittee, and by article 11 it was made the duty of such committee to
   advise with and approve purchases and sales made by the president.
   The president was in control of the entire business of the company, and
   he; his son, and wife were the owners of practically the whole of the
   capital stock; the son acting as secretary. Held that, the president
   having conducted the business of the company as though he were vested
   with full power to do all things requisite to the purchase and sale of real
   property, the corporation was estopped to deny that he had authority
   to bind it by a contract for the sale of real estate, and with the secre-
   tary to execute a deed to convey the title.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1697–1701;
   Dec. Dig. § 425.*]

In Equity. Suit for specific performance by the Minnesota & Ore-
gon Land & Timber Company and another against the Hewitt Invest-
ment Company. Decree for complainant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

This is a suit to compel the specific performance of an alleged contract or agreement for the sale and conveyance of certain real property by the defendant, the Hewitt Investment Company, to the plaintiff Minnesota & Oregon Land & Timber Company. The plaintiff E. Z. Ferguson was the agent of the Land & Timber Company, and was authorized to contract for and to purchase timber lands for said company in his name. About December 22, 1905, the defendant Investment Company executed to Ferguson a deed to 640 acres of timber land situated in Clatsop county, Or. On that date Henry Hewitt, Jr., who was the president of the Investment Company, transmitted the deed from Tacoma, Wash., to the Astoria National Bank in Astoria, Or., with directions to the bank to deliver the deed to Ferguson for $12,800 net to the grantor in Tacoma funds. The letter and deed were received by the bank on the following day. The $12,800 was paid into the bank by Ferguson on January 3, 1906, with instructions to deliver the same, when the title to the land should be made perfect in him, Ferguson, to the Investment Company in Tacoma Exchange, and that, pending the perfecting of said title, the bank should hold the money and deed in its possession. Ferguson at the time specified certain defects in the title which needed correction. On January 5th the Investment Company requested of the bank a return of the deed. The deed was returned on January 9th for correction. Thereafter the Investment Company kept the deed, and finally refused to make any correction, or to return the same to the bank, or to deliver it to Ferguson. The plaintiffs allege, in effect, that the deed was deposited with the bank in escrow, so understood and treated by all the parties, and that it, together with the arrangement whereby it was so placed in escrow, and the letters passing between the parties attending the transaction, constituted a valid and binding contract, whereby the defendant agreed to sell and the plaintiffs to purchase the lands described in the deed at and for the consideration of $12,800, and that plaintiffs are entitled to have the same specifically enforced. The defendant controverts the claim of plaintiffs, and avers that Ferguson and Henry Hewitt, Jr., had a personal understanding, but not in writing, whereby it was agreed between them that defendant should sell and convey to the plaintiff Ferguson the lands described in the deed for the consideration of the sum of $12,800 in Tacoma funds to be paid by Ferguson to defendant, and in further consideration that Ferguson could and would procure and deliver to defendant in exchange therefor at and for an equal price based upon the estimate of timber thereon at 50 cents per thousand feet of stumpage, the title to a quantity of other timber lands containing an equal estimate or more of timber situated in Columbia county, Or., lying adjoining certain timber lands then owned by defendant. These averments are denied.

C. W. Fulton, of Portland, Or., for plaintiffs.
E. R. York, of Tacoma, Wash., for defendant.

WOLVERTON, District Judge (after stating the facts as above). That the parties, Henry Hewitt, Jr., acting on the one part and E. Z. Ferguson on the other, had an understanding that the defendant company should deed the lands in dispute to Ferguson for a consideration of $12,800, there is no dispute. But there is a dispute as to whether Ferguson as further part consideration for the sale to him agreed to secure other lands for the defendant company adjoining some that it held in Columbia county. It is also disputed that the deed was delivered to the bank in escrow, and it is affirmed that whatever negotiations might have taken place relative to the sale of such lands by defendant company to Ferguson were not in writing, and therefore not binding or obligatory upon the defendant. There is a controversy also whether the negotiations were had with the defendant company

or with Henry Hewitt, Jr., individually and upon his own account, and whether the company or its officers were authorized to execute the deed in question.

The negotiations were attended with considerable correspondence, and it will aid us materially first to take note of that. On July 24, 1905, Ferguson wrote the Hewitt Investment Company:

"You will remember that I have corresponded with you and also had a personal interview with your Mr. Hewitt some time since, in regard to the four claims that you own in 6/6, but at that time the price that you were asking for this land, was more ·than our parties would pay. I notice from the plats in my office that you are the owner of quite a little bunch of land in 5/3 and 5/4, Columbia· Co., and I would like to know if you would consider a proposition to trade your 4 claims in 6/6 for four claims adjoining the land that you own in Columbia Co., providing of course, that the land was as well timbered with as good a quality of timber. Our information on this subject shows the timber to be about the same in both localities."

Hewitt answered at the foot of the letter, and returned it:

"Yours received on my return. I hardly care to trade lands. I might sell the whole bunch at 20.00 per acre. It is heavily timbered, will average from 6 to 9 M per claim. One claim somewhat burnt."

Again, on August 17th, Ferguson wrote, inquiring whether the Investment Company would consider a proposition for an exchange of lands, and on September 25th as follows:

"Your letter of recent date stating that you would not care to trade your lands, but that you would sell them all for twenty dollars per acre, received, but in reply I have to say that there seems to be a very poor prospect of making a sale of this tract at the present time. Timber buying has dropped off, and there is practically no timber changing hands. It may be better after awhile. I am authorized to offer you eight thousand dollars for the four hundred acres in 6–6. As you know one of these claims is partially burned. One of them is better than the average, and the other two are just about up to the average, in that part of the country, and the price offered you is more than has been paid any one else in the township. The timber is mostly red and bastard fir; practically no yellow fir."

On December 22, 1905, Hewitt wrote the Astoria National Bank:

"Please deliver the enclosed deed of lands in 6–6 West to E. Z. Ferguson for $12,800.00 net to us in Tacoma funds. We have notified Mr. Ferguson and he will probably call for the deed at an early date."

He also wrote Ferguson as follows:

"We have to-day sent deed for lands to Astoria N. Bk. which they will deliver to you on payment of 12,800.00. I will send you a check for commissions when money is received of 2½%. Our directors would not allow more & in fact did not like to deed the land at all. We consider this land worth 30,000. However if you can find us the land you promised, will send my son or another good cruiser to look over lands & in some way make good my promise to you. Now hustle & find the other land. It must be come-at-able & good logging chance finally."

By a coincidence Ferguson wrote Hewitt on the same day:

"I have just completed the abstracts for your land, but have not yet given them to the attorney. I have however looked them over myself and find one matter that needs attention. There are four deeds to the Hewitt Investment ·Co. and each is signed Lester B. Lockwood, Hattie M. Lockwood by Herbert S. Griggs her attorney in fact, and we do not find any power of

attorney of record from Hattie M. Lockwood. It will be necessary to have this or else a deed from Hattie M. Lockwood. Please inform me if you have the P of A, and if so send it with your deed to the Bank; if not, can you get a deed from her? If the attorney finds anything else will let you know, but I do not think there is anything else. Of course you are aware that in Oregon the wife has a dower and her signature is more important than in Washington. Up to this time I have been too busy to send you the map of the other lands, but will do so soon. There is quite a little work to make it up. When can I expect the deed?"

· On December 23d J. E. Higgins for the bank acknowledged receipt of Hewitt's letter with inclosure.

On January 3, 1906, Ferguson wrote the bank:

"Relating to the deed from the Hewitt Investment Co. to E. Z. Ferguson, the undersigned, said deed being in your possession to be delivered to me upon the payment of $12,800 and purporting to convey the following described land, to wit: [Description of land.] I have to say that the following matters in connection with the title to said land need to be corrected. In the said deed the description reads T. 6 S., whereas it should read T. 6 N., also there is lacking in the title to said land a power of attorney from Hattie M. Lockwood to Herbert S. Griggs, which said power of attorney should be furnished by the Hewitt Investment Co. and placed of record. It also appears that the Hewitt Investment Co. has not complied with the Oregon laws governing foreign corporations. I therefore deposit with you herewith the sum of $12,800.00 in gold coin of the United States, made payable to the said Hewitt Investment Co. with instructions that you shall, when ·the title to the said land shall have been made perfect in me, deliver to the said Hewitt Invest. Co. the said $12,800 in Tacoma Exchange, and that pending the making of said title perfect in me, you shall hold this money and deed in your possession."

On the same day Ferguson wrote Hewitt Investment Company:

"On Dec. 26th I wrote you in regard to the title of your land which I am purchasing, stating that there was lacking in the title, a power of attorney from Harriet M. Lockwood to Herbert S. Griggs, but up to this time, have no reply. My attorney has examined the abstract in regard to this title, but in addition to the power of attorney which is lacking, he finds two other matters which need attention. In the deed, which you sent here, the description reads T. 6 S. instead of T. 6 N., also it does not appear that the Hewitt Investment Company has complied with the Oregon laws governing foreign corporations. I think for your own protection, that you would wish to straighten up this last matter on account of your other land in Oregon. I do not know how seriously this affects the title, but think it would be better if it was straightened ·up. I have to-day deposited in the Astoria National Bank, the sum of $12,800, the sum to be sent to you in Tacoma Exchange when the title to this land is made perfect in me. I do this so that you will understand that I am not endeavoring to gain time, but am ready and willing to take over the deal whenever it is in shape for delivery."

He also wrote Henry Hewitt, Jr., as follows:

"This morning I wrote to the Hewitt Investment Co., which letter you will undoubtedly receive about the same time that you receive this, and at noon to-day, I received your letter of the 2nd, to which I hasten to reply. I think, in order to get this matter straightened up with the greatest possible speed, it would be best for you to prepare a new deed making it just the same as the former deed, excepting to state that the land is all in T. 6 N. R. 6 W., W. M., instead of T. 6 S. as it now reads. It is evident from the deed in the bank that you have a copy and can see how this mistake occurred. This deed you can send to the bank to be substituted for the one that is now in their hands. If at the same time, you have an original power of· attorney

to Mr. Griggs from Harriet M. Lockwood, it could be sent over and recorded in this county; if you haven't the original, you can have a certified copy made from the records there which will answer the same purpose, but before doing this, I would suggest that you examine the power of attorney carefully and see if it conveys sufficient power to enable Mr. Griggs as her attorney to convey land in Oregon, otherwise, it would be of no use and it would be necessary to obtain a deed direct from Mrs. Lockwood. Under the Oregon laws, the wife's interest is absolutely necessary to have. We are very particular in regard to our titles, because we expect to sell this land some day and do not wish to have any trouble when the time comes. In regard to the Hewitt Investment Company's having failed to comply with the Oregon laws governing foreign corporations, we will not let this delay the deal, but will take it for granted that you will straighten it up at your leisure, but would like to know, when you write me, the exact amount of the Company's incorporated capital."

On January 5th the Hewitt Investment Company wrote the bank requesting a return of the deed, as follows:

"The Hewitt Investment Co. or Henry Hewitt, Jr., sent you some time ago deeds to deliver to E. Z. Ferguson on payment of 12800 I think. The deeds it seems are faulty & Mr. Ferguson wants them changed. You will please return them & oblige."

On the same day Hewitt wrote Ferguson:

"Your favor Jan. 3 received. I have written Astoria Nat. Bank to return deeds & as you suggest will make out new deeds. Mr. Griggs has the old Hattie Lockwood deeds signed by him as power of attorney & will send new deed for her to sign. It may take some little time. About the commission, the Co. some time ago passed resolutions to only allow 2½ commissions for sales of lands, of which I was not informed, & besides this when I brought the matter up the directors all but myself were against selling & would not have consented at all only to accommodate me. I should have brought the matter up. Of course you know what any officer promises is only good for his best endeavors to carry out his promise. You are mighty lucky to get the land at all. * * * Advise bank to return deeds."

On January 8th Ferguson wrote Hewitt:

"Replying to your favor of the 5th, I have to say that the bank has informed me that they would return the deeds to you by to-night's mail. I suppose it will take two or three weeks for you to get them straightened out. In any event, the money will be left at the bank for you as soon as the title is completed. * * * Some time this week, I will send you a plat of Columbia County, showing your lands there, as well as the surrounding timber, and statement of what I believe would be possible in adding to your holdings in that locality."

And on January 25th Ferguson again wrote Hewitt:

"If it can be arranged satisfactory to all of us, I would rather pay the money over to you. In case we would pay the $12,800 to the Hewitt Investment Company and take its warranty deed to the land, would you and the company be willing to give me an agreement and assurance that you would perfect the title, say within a year, or longer, if need be? I see no reason why we cannot fix this up without difficulty; the power of attorney may turn up, or in any event, Mrs. Strong will get through her honeymoon some time and come home. Do you know when she procured her divorce? It may be that this would straighten the matter; in any event, it seems to me that if you get the money and we know the title to the land is going to be perfected, that is all that is necessary and we can all sleep the sleep of the just. At your rate of interest, the money in the bank is losing nearly $100 a month and I hope we can get it into your hands with the greatest possible speed and would therefore request an early reply."

This comprises practically the whole correspondence found in the record bearing upon the dealings of the parties respecting the land in controversy. Somewhat is said touching the amount of the commission Ferguson was to get for making sale of the land. This is not now a matter of dispute. And much is said respecting other lands looking to some further negotiations, but it does not elucidate the transactions of the parties with reference to the particular land here in controversy.

As will be noted from the correspondence, Ferguson made inquiry of the Hewitt Investment Company looking towards the exchange of certain lands in Columbia county for those in dispute, designated as the claims in 6—6. The exchange of lands was declined, but Hewitt indicated that he might sell "the whole bunch" for $20 per acre, saying the land was heavily timbered, and would average from 6,000,000 to 9,000,000 feet per acre. Then by Ferguson's letter of September 25, 1905, he offered $8,000 for the "four hundred acres in 6—6." Nothing seems to have come of this offer. The parties talked with each other on occasion, and finally it was agreed between them, but not by specific note or memorandum in writing, that the defendant company would sell and Ferguson would purchase the 640 acres of land in controversy. Looking to a consummation of the agreement, the defendant sent its deed purporting to be executed and acknowledged in favor of Ferguson to the Astoria National Bank to be delivered to Ferguson on his payment into the bank for the defendant of the sum of $12,800. To this point the contestants are agreed, except that the defendant claims that Ferguson agreed, as part of the same transaction, that he would procure for defendant other lands in Columbia county containing an equal estimate or more of timber at a price equivalent to 50 cents per thousand feet in the stump. Ferguson denies that any agreement was reached between them touching these other lands. There was much conversation between them, and much was said in the correspondence respecting other lands situated in Columbia county, and lands adjoining lands belonging to the defendant in such county, whereby it appears that Ferguson was endeavoring to find for the defendant lands which the latter desired to purchase if the timber was suitable and the price satisfactory. But the strong preponderance of the evidence is against the conclusion of any definite agreement, either oral or written, as claimed by defendant. It is enough, it seems to me, to set this matter at rest that the parties agreed that the $12,800 consideration for the lands in dispute was to be paid through the bank directly to the defendant company. No part of this money was to be used by Ferguson for the purchase of other lands, and there was to be no direct exchange of the lands in question for those other lands spoken of. Had it not been for the irregularities found in the title, the agreement touching the lands in dispute would have been fully closed and executed by the final passing of the deed through the bank and the payment of the consideration therefor. It is unlikely that the parties would be willing thus to close up the matter in that respect if the dealings as to the other lands were of such importance as is claimed for them. The defendant desired to, no

doubt, and would have purchased other lands as a further investment, and Ferguson busied himself to a greater or less extent in endeavoring to find such lands. When found, the timber thereon was to be subject to the cruise of the defendant, and the price depended upon what they could have been purchased for in the market, so I conclude on this subject that, while the parties canvassed the matter respecting the purchase by defendant through Ferguson of other lands, there was no definite agreement arrived at as to this, nor did any agreement of the kind form or constitute a part of the agreement to sell and convey the lands in dispute.

The essential controversy hinges about the contract to convey. The defendant insists that it was verbal only, and, being concerning land, was a nullity; while, on the other hand, it is contended that considering the correspondence between the parties, together with the deed and the manner of its treatment and disposal, the contract was in writing, or of such a character as to preclude the application of the statute of frauds. This includes the suggestion that the deed was by agreement of the parties placed with the bank in escrow, to be held by it subject to the payment by Ferguson of the consideration to be accounted for to the defendant. The Hewitt Investment Company denies that there was any understanding or agreement that such deed should go to the bank in escrow, and claims that the deed was only sent to the bank as the agent of the defendant to carry out its instructions respecting the same.

Ferguson testifies that on a particular trip he made to Tacoma, where Hewitt lived, he and Hewitt, who was acting for the defendant company, agreed upon a deal whereby the defendant would sell the four claims to plaintiff for the consideration of $20 per acre, or the aggregate sum of $12,800, and that Hewitt "would send the deed over to the Astoria National Bank." "He," continues the witness, "told me that he would have the deed executed, and would send it over, and I was to go home, which I did, and pay the money." At the close of his examination he further testifies respecting the same subject:

"Q. Mr. Ferguson, I wish you would explain to the court how it happened that the deed was sent over to the Astoria National Bank by Mr. Hewitt. A. Why, I think I requested him to send it to the Astoria National Bank. * * *

"Q. What did he say in regard to doing that? A. Why, he said that he would have it fixed up; said he would have to have a meeting of the board of directors, and that he would fix it up; and that is when I asked him about the board of directors, and he told me that he was practically the whole thing; that he and his son owned all the stock.

"Q. So you suggested to him to send it to the Astoria National Bank, and what were you to do when he sent it to the Astoria National Bank? A. Why, of course, I told him the abstracts would have to be made; and, if we found the title was all right, we would pay the money. That was the general understanding with things of that kind.

Cross-examination:

"Q. Mr. Ferguson, that was just a matter of detail between you and Mr. Hewitt? A. Yes.

"Q. But that was not any special matter of agreement at all, was it? A. Well, I suppose it would be just as much an agreement as all our talk was at that time.

"Q. But did you have any special agreement as to the conditions under which the deed was to be sent to the bank? A. Nothing. I don't think anything special.

"Q. Or any as to the conditions under which the money was to be paid into the bank by you? A. Well, of course, I don't know—

"Q. I mean, was there any special agreement at that time on the subject? A. I don't know as there was any special agreement. I don't remember just what was said between us on that subject at that time.

"Q. Mr. Hewitt was to go ahead and have the deed executed, and send it down? A. Send it over, and we would have an abstract of title made, and, when the title was perfect, we would pay the money and take the deed. That would be the usual method of procedure.

"Q. (Redirect) That was the custom, was it? A. Yes."

[1] A deed in escrow is one that has been delivered to a stranger, with directions that he shall deliver to the grantee upon performance by the latter of some condition, as the payment of a sum of money, or the observance of some obligation, or the happening of some event, the grantor reserving the right to reclaim the deed if the condition is not fulfilled, or the event does not happen. Wier v. Batdorf, 24 Neb. 83, 38 N. W. 22, 23; 16 Cyc. 561. And it would seem that it is not essential that the condition upon which the instrument is delivered in escrow be evidenced by writing. It may rest in parol, or it may be partly oral and partly in writing, and may be established by oral testimony. 11 Am. & Eng. Enc. of Law (2d Ed.) 343; Gaston v. City of Portland, 16 Or. 255, 19 Pac. 127; Cannon v. Handley, 72 Cal. 133, 13 Pac. 315. But it is not essential here to inquire strictly as to these matters. I have concluded that what was done and what was written relative to the transaction, including the deed that was sent to the bank, constituted a valid contract in writing for the sale of these lands by the defendant to plaintiff Ferguson. The earlier correspondence shows that Ferguson was desirous of making an exchange of lands. All proffers on this basis were declined by the defendant. After some further correspondence and negotiation, the parties agreed verbally upon the sale of four claims at the price of $20 per acre, or $12,800. The deed was executed. It contained a description of the land to be sold, and expressed the consideration, and was in apt form of conveyance by a corporation.

[2] Standing alone without delivery, unless deposited as a perfect escrow, it would not be sufficient as a contract to convey, and specific performance could not be predicated upon it.

[3] But there is more here, and the parties have practically confirmed in writing what they agreed to orally. On the same day the deed was sent to the bank Hewitt, who was acting for defendant, wrote Ferguson:

"We have to-day sent deed for lands to Astoria National Bank, which they will deliver to you on payment of $12,800."

It would seem from the letter written by Ferguson to Hewitt on the same day, without knowledge that Hewitt had written, that Ferguson had previously had in his possession the abstract of title to the land, for he points out an irregularity in such title. He requests of Hewitt, furthermore, if he has in his possession a certain power of attorney, the instrument upon which the irregularity depends, that he send it

along with the deed to the bank. On January 3, 1906, Ferguson wrote again to the Hewitt Investment Company, stating that his attorney had examined the title, and had found two other matters which needed attention. One was that the description of the deed designated the land as in township 6 S., instead of 6 N., as it should be, and the other that the Investment Company had not complied with the Oregon laws governing foreign corporations. It should be said in this connection that the deed described the lands as lying in Clatsop county, Or., which cured the defect to which attention was called as to description. The letter also stated that Ferguson had on that day deposited in the bank $12,800 to be sent to the defendant when the title was made perfect. On the same day, January 3d, Ferguson also wrote to Hewitt, suggesting that, in order to get the matter straightened up speedily, it would be best for Hewitt to prepare a new deed making it just the same as the former deed, the one in the bank, excepting to state that the land was in township 6 N., instead of township 6 S., "as it now reads," and further suggesting: "This deed you can send to the bank to be substituted for the one that is now in their hands." Other suggestions were made relative to the power of attorney, and Ferguson advised Hewitt that he would not let the noncompliance on the part of the company with the Oregon laws "delay the deal." On January 5th the Hewitt Investment Company requested the bank to return the deed. On the same day Hewitt wrote Ferguson that he had written the bank for the return of the deed, and that, as suggested by Ferguson, he would make out a new deed. He also requested Ferguson to advise the bank to return the deed. Ferguson had previously, to wit, on January 3d, deposited the $12,800 with the bank, and written it to deliver the said sum in Tacoma exchange to the Hewitt Investment Company when the title to the land had been made perfect in him, Ferguson, and that, pending the making of said title perfect, it should hold the money and deed in its possession. On January 8th Ferguson wrote Hewitt that he had been informed by the bank that it would return the deed, and further stated:

"I suppose it will take two or three weeks for you to get them straightened out. In any event, the money will be left at the bank for you as soon as the title is completed."

Now, taking this correspondence together, including the deed and the treatment thereof by the parties, I am of the opinion that it constitutes an agreement in writing in effect such as is required by the statute of frauds respecting sales of land. The deed, while deposited with the bank, was not withdrawn except by the consent of Ferguson, and, when withdrawn, it was understood that another would be substituted in its stead, with the corrected description, when the title could be straightened out. The deed, treated as a memorandum, expressed the consideration, described the property to be conveyed, and was subscribed by the party to be charged. This was to be replaced by a new deed with an amendment in the description—an amendment not altogether material to a valid conveyance of the land. The correspondence, aside from the deed, comes near if not quite fulfilling the like requirements of a contract for the sale of lands. But the deed, under

the agreement by which it was withdrawn from the bank, must be considered as subsisting, even though in the hands of the Investment Company, until a new deed is produced to take its place. It was not canceled nor ultimately surrendered. It was allowed to be returned until a new one should be produced to take its place, the money remaining ready at all times to be paid over when the arrangement was consummated. Without else, the contract is valid, and one that a court of equity would require to be specifically performed. In support of this view, see Flegel v. Dowling, 54 Or. 40, 102 Pac. 178, 135 Am. St. Rep. 812, 19 Ann. Cas. 1159; Alexander v. Vandercook, 136. Mich. 642, 99 N. W. 858; Regan v. Howe, 121 Mass. 424. The irregularity as to compliance with the Oregon laws by the Hewitt Investment Company was waived by the letter which has been noted. As to the power of attorney, Ferguson testifies that he remembers finding one in the records at Tacoma, and that he told Hewitt he would be satisfied with a certified transcript of it, as far as the title was concerned, and requested the deed of him, but that he has not delivered it nor surrendered the corrected deed. It seems, therefore, that Ferguson did not further insist upon the title being corrected as first requested, and was willing to take the title as it was under the warranty of title, thus relieving the transaction of the objections first made as to the title. No further obstacle remaining, the Hewitt Investment Company should have redelivered the old deed or executed and delivered a new deed to take its place.

[4] I am not favorably impressed with the defense as elucidated by the testimony that the Investment Company was not authorized to execute the deed. Henry Hewitt, Jr., was in control of the entire business of the company, and he and his son, J. J. Hewitt, and perhaps his wife, were the owners of practically the whole of the capital stock. J. J. Hewitt, the son, was secretary. The by-laws of the company would seem to authorize the president, with the approval of the other members of the finance committee—such committee consisting of the president and two other members of the board of directors—to buy and sell real property without further specific authority from the board. By article 7 he is made general manager, "with full power to buy real estate * * * or anything which the company is entitled to hold, buy and sell, subject to the approval of the finance committee," and by article 11 it is made the duty of the finance committee "to advise with and approve the purchases and sales made by the president." Evidently Henry Hewitt, Jr., has conducted the business of the company as though he were vested with full power to do the things requisite to the purchase and sale of real property, all in the name of the company, and his conduct in connection with the transaction now in controversy was in accord with such practice. Under such conditions and practice, the Hewitt Investment Company ought to be and is estopped to deny the authority of Hewitt to enter into the contract or agreement in question to execute with the secretary the deed necessary to convey the title. The plaintiffs are therefore entitled to a decree requiring the defendant Hewitt Investment Company to execute and deliver to Ferguson a deed in form as executed and

placed in the bank to the premises in question. The defendant, however, is entitled to the fund deposited in the bank as consideration for the land, and, having paid the taxes on the land since the deed was first executed, should have a decree for the repayment to it by plaintiffs of such taxes, with interest at the rate of 6 per cent. per annum from the time of payment, amounting in the aggregate to $1,716.